[Docket Nos. 20, 22]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

LOGAN GENERATING
COMPANY, L.P.,

           Plaintiff,

    v.

DANN MARINE TOWING, LC,

        Defendant.

Civil No. 22-2815 (RMB/MJS)


**OPINION**

**APPEARANCES:**

EVERSHEDS SUTHERLAND (US) LLP
By: Francis Xavier Nolan, IV, Esq.
1114 Avenue of the Americas, 40th Floor
New York, New York 10036

    *On behalf of Plaintiff Logan Generating Company, L.P.*

PALMER BIEZUP & HENDERSON LLP
By: Daniel Harold Wooster, Esq.
923 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002

    *On behalf of Defendant Dann Marine Towing, LC*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon the Motion to Dismiss and Motion

for Summary Judgment filed by Plaintiff Logan Generating Company, L.P. ("**Logan**")

on September 7, 2022.  [Docket Nos. 20, 22.[1]]  Thereafter, Defendant Dann Marine Towing, LC ("**Dann Marine**") filed a consolidated Opposition, [Docket No. 27 ("**Def.'s Opp'n**")], and Logan submitted a consolidated Reply Brief, [Docket No. 29 ("**Pl.'s Reply Br.**")].[2]  As these Motions have been fully briefed, they are ripe for adjudication.  For the reasons that follow, the Court will **GRANT**, in part, and **DENY**, in part, Logan's Motion to Dismiss.  It will further **GRANT**, in part, and **DENY**, in part, Logan's Motion for Summary Judgment.

## I.    BACKGROUND

This action involves a dispute arising out of a maritime contract for the transportation of coal from Baltimore, Maryland to a New Jersey power plant situated on the Delaware River.  The parties appear to agree on the facts underlying their dispute, but they maintain different interpretations of the agreement's termination provision—and each other's motives.  The Court begins by summarizing the parties' relationship and contractual arrangement before turning to the provisions material to this litigation.  Unless otherwise noted, the Court understands the following facts to be either undisputed or true for the purposes of resolving Logan's Motion to Dismiss.

Logan is the owner and operator of a coal-fired electric generation facility in Logan Township, New Jersey.  [Pl.'s Statement of Material Facts ¶ 1, Docket No. 24

---

[1] Logan's supporting briefs are referenced as follows: Docket No. 21 ("**Pl.'s Br. Supp. Mot. Dismiss**"); and Docket No. 23 ("**Pl.'s Br. Supp. Mot. Summ. J.**").

[2] On October 11, 2022, the Court granted Logan leave to file an overlength, consolidated Reply Brief.  [Order, Docket No. 30.]

("**SOMF**").]  In 2008, Logan entered into a Coal Transportation Agreement (the "**2008 Agreement**") with Express Marine, Inc. ("**Express Marine**").  [Countercl. ¶ 4, Docket No. 13.]  The 2008 Agreement became effective on April 7, 2008 and continued through December 31, 2015.  [Countercl. ¶ 6.]  In 2012, during the term of the 2008 Agreement, Dann Marine—another marine transportation services company—purchased the barge that Express Marine used to transport coal for Logan and, pursuant to an unrelated agreement, assumed Express Marine's interest in the 2008 Agreement.  [*Id.* ¶¶ 7, 10.]  Dann Marine continued performing its obligations thereunder, and after the term expired, Logan presented Dann Marine with an amended and restated agreement to represent a "continuation of, and not a novation of," the 2008 Agreement.  [*Id.* ¶¶ 11, 12, 14.]

On May 25, 2016, Logan and Dann Marine entered into the Amended and Restated Coal Transportation Agreement (the "**Transportation Agreement**") for the transport of coal from Baltimore, Maryland to Logan's facility in Logan Township.  [SOMF ¶ 3.]  The Transportation Agreement became effective on May 25, 2016 and was scheduled to continue through December 31, 2024, unless terminated pursuant to the agreement.  [Transportation Agreement § 2.1, Docket No. 2-1.]  The Transportation Agreement includes the customary recitals regarding consideration, and it provides for the application of maritime law, to be supplemented, where required, by the laws of the State of New York.  [*Id.* § 17.4.]  It also specifically disclaims application of the principle of *contra proferentem*. [*Id.* § 17.5 ("The Parties

acknowledge that each Party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be used in interpretation of this Agreement.").]

The Agreement contains other idiosyncratic provisions. For instance, it provides that Dann Marine's right of demurrage[3] shall only apply when certain circumstances obtain, specifically:

> 6.3    Demurrage. . . . The Parties agree that demurrage at the Facility will only apply when [Dann Marine] has scheduled the Barge for other work between deliveries to the Facility. [Dann Marine] shall provide notice of alternative use to [Logan] at least seventy-two (72) hours prior to the arrival of the Barge to the Facility.

[Id. § 6.3.] Furthermore, the Transportation Agreement provides that Logan will be responsible for reimbursing Dann Marine for costs associated with repairs for any damage Logan causes to Dann Marine's barge during the course of unloading or loading cargo. [Id. § 5.4.] Finally, unlike the 2008 Agreement, the Transportation Agreement includes the following termination provision:

> 2.2    Termination. [Logan] may terminate this Agreement immediately upon written notice to [Dann Marine] in the event that [Logan] intends to permanently cease burning coal at the Facility for any reason, including, without limitation, because of voluntary or discretionary business decision or as a result of any statute, rule, regulation, Legal Proceeding, Governmental Imposition, or otherwise.

[Id. § 2.2.] According to Dann Marine, Logan inserted the foregoing termination

---

[3] "Demurrage" refers to liquidated damages owed to a shipowner for the charterer's failure to load or unload cargo by a specified time. Demurrage, BLACK'S LAW DICTIONARY (11th ed. 2019).

4

provision into the Transportation Agreement knowing that it would likely cease burning coal at its facility before December 31, 2024 but without disclosing this information to Dann Marine.  [Countercl. ¶¶ 20, 21.]

Several months before March 2022, Logan began negotiating with the Atlantic City Electric Company ("**ACE**"), which it supplied electrical power, to cease burning coal in exchange for a series of payments.  [*See* SOMF ¶ 10; Countercl. ¶¶ 22, 23.]  On March 23, 2022, the New Jersey Board of Public Utilities ("**NJBPU**") approved a petition filed by ACE to modify its power purchase and sales agreements with Logan and the only other coal-fired electrical generation facility in the State of New Jersey. [SOMF ¶ 10.]  Pursuant to NJBPU's approval, Logan agreed to cease burning coal and ACE agreed to remit $120 million to Logan.  [*Id.*]  The Court takes judicial notice of the broader context: NJBPU's decision follows a comprehensive effort in the State of New Jersey to reduce greenhouse gas emissions and to transition to clean energy capabilities.  Press Release, N.J. Bd. Pub. Utils., *NJBPU Approves ACE Modified Power Purchase Agreements Ending the Use of Coal Generation in the State* (Mar. 23, 2022), https://nj.gov/bpu/newsroom/2022/approved/20220323.html; *see also* Jim Walsh, *Agreement Will End Coal-Burning at Two South Jersey Power Plants*, COURIER POST (Mar. 23, 2022), https://www.courierpostonline.com/story/news/2022/03/23/coal-burning-power-plants-new-jersey-starwood-atlantic-city-electric/7144373001/. NJBPU's approval was necessary for the agreement between ACE and Logan to become effective.  [SOMF ¶ 10.]

On March 18, 2022, as Dann Marine's barge was unloading at Logan's berth, Logan informed Dann Marine orally and in writing that its March 18th delivery of coal would be its last.  [SOMF ¶ 11; *see also* Mar. 18, 2022 E-mail from Logan to Dann Marine, Docket No. 23-1.]  According to Dann Marine, this was the first time Logan indicated that it was intending to cease burning coal or that it was intending to terminate the Transportation Agreement.  [Countercl. ¶ 21.]  A month later, on April 13, 2022, Logan sent a formal Notice of Termination via e-mail indicating that, "Pursuant to Section 2.2, Logan hereby terminates the Transportation Agreement effective **May 15, 2022**."  [SOMF ¶ 12; *see also* Apr. 13, 2022 Ltr. from J. Delgado to Dann Marine, Docket No. 23, Ex. 2.]  Shortly thereafter, on or around May 31, 2022, all coal-fired power generation at Logan's facility permanently ceased.  [SOMF ¶ 13.]

Following receipt of Logan's Notice of Termination, Dann Marine objected to Logan's right to terminate the Transportation Agreement and demanded at least $4,393,066.20 in damages for lost revenues related to future coal deliveries.  [Countercl. ¶¶ 31, 32.]  In its Counterclaim, Dann Marine also alleges that Logan damaged its barge during the course of loading and unloading cargo and claims $90,000 in damages for costs to transport the barge to a shipyard for repairs as well as $675,000 in demurrage for time lost.  [*Id.* ¶¶ 35–37.]

Unable to resolve their differences out-of-court, Logan filed the instant action on May 13, 2022 seeking declaratory relief and a pronouncement from this Court that the Transportation Agreement is terminated and Logan owes no further obligations to Dann Marine thereunder.  [Compl. ¶ 28, Docket No. 1.]  Following an extension, on

August 1, 2022, Dann Marine filed (a) an Answer disputing Logan's interpretation and raising affirmative defenses and (b) Counterclaims against Logan for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment. [Docket No. 13.]

On September 7, 2022, Logan filed its Motion to Dismiss Dann Marine's Counterclaims and its Motion for Summary Judgment as to its claim for declaratory judgment. [Docket Nos. 20, 22.]

## II.   JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over Logan's claim for declaratory judgment pursuant to 28 U.S.C. § 1333, as this action involves a dispute over a maritime transportation contract and the parties agreed to the application of maritime law.  Accordingly, the Court invokes its inherent admiralty and maritime jurisdiction to adjudicate Logan's claim.  Moreover, the Court finds that venue in this judicial district is proper, as the dispute occurred in New Jersey and the parties do not otherwise contest venue.  Furthermore, the Court exercises subject matter jurisdiction over Dann Marine's Counterclaims pursuant to 28 U.S.C. § 1332, as there exists a "complete diversity" of citizenship between the parties and the amount in controversy exceeds $75,000.

## III.   LEGAL STANDARD

When considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light

most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005).  It is well-settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted) (first citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957); then citing *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994); and then citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (alterations in original) (citations omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 675, 679 (2009)).  A court may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff

will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Twombly*, 550 U.S. at 563 n.8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' "); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("*Iqbal* . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly*.").  "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Malleus*, 641 F.3d at 563 (quoting *Twombly*, 550 U.S. at 570).

A court will grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" only if it might impact the "outcome of the suit under the governing law."  *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012).  A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party.  *Id.*

In deciding whether there is a disputed issue of material fact, the court must view all inferences, doubts, and issues of credibility in favor of the non-moving party. *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." *Connection Training Servs. v. City of Phila.*, 358

F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." *Id.*

In the face of a properly supported motion for summary judgment, the non-movant's burden is rigorous. The non-movant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and conjecture may not defeat a motion for summary judgment") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

## IV.   DISCUSSION

The Court first considers Logan's Motion to Dismiss Dann Marine's Counterclaims before turning to Logan's Motion for Summary Judgment as to its claim for declaratory relief.

### A.   Motion to Dismiss

As previewed above, Dann Marine asserts four Counterclaims against Logan. First, Dann Marine claims that Logan is liable for breach of contract because Logan failed to provide notice of termination *as soon as* it formed an intent to permanently cease burning coal at its facility, in violation of § 2.2 of the Transportation Agreement.[4]

---

[4] Because the Transportation Agreement is integral to Logan's Complaint and explicitly referenced therein and in Dann Marine's responsive pleading and the accompanying memoranda of the parties, the Court may consider it to decide the

[Countercl. ¶¶ 38–43.]  Dann Marine also claims that Logan's failure to pay (a) the cost of towing its barge for repair and (b) demurrage while the barge awaited repair both constitute breach of contract.  [*Id.*]  Second, relatedly, Dann Marine asserts that Logan breached the covenant of good faith and fair dealing by failing to disclose at the time the Transportation Agreement was executed and thereafter that there was a likelihood that Logan would cease burning coal at its facility *before* the end of the agreement's term (*i.e.*, December 31, 2024).  Depriving Dann Marine of the fruits of the contract, the termination was allegedly accomplished in bad faith.  [*Id.* ¶¶ 44–49.]  Next, third, Dann Marine claims that Logan fraudulently induced it to execute the Transportation Agreement by failing to disclose its intention to cease burning coal prior to the end of the contract's term.  [*Id.* ¶¶ 50–55.]  This caused Dann Marine to agree to transportation rates materially lower than they would have been had Dann Marine known of Logan's intention.  [*Id.*]  Finally, Dann Marine asserts that Logan was unjustly enriched by its receipt of $120 million from ACE in conjunction with "below-market rates during the term of the [Transportation Agreement]."  [*Id.* ¶¶ 56–60.]

In essence, Logan's Motion to Dismiss is premised on the argument that § 2.2

---

instant Motions.  *See Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) ("a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks omitted); *see also Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (addressing the scope of what a court may consider when resolving a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)).

of the Transportation Agreement unambiguously permitted Logan to terminate the contract on April 13, 2022, when it provided written notice to Dann Marine via e-mail. [Pl.'s Br. Supp. Mot. Dismiss 3–5.] From this premise that it complied with the plain language of the Transportation Agreement, Logan concludes that Dann Marine's Counterclaims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). [*Id.* at 3.] The Court addresses each claim, and the parties' arguments in response thereto, in turn.

### 1.   *Breach of Contract Claims*

To establish its breach of contract counterclaims, Dann Marine must demonstrate: (1) the existence of an agreement; (2) adequate performance of the agreement by Dann Marine; (3) breach of the agreement by Logan; and (4) damages. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Zim Am. Integrated Shipping Servs. Co. v. Aegis Trading & Shipping Co.*, 2014 WL 5286102, *1–*2 (S.D.N.Y. July 23, 2014) (considering claim alleging breach of maritime contract).[5] Here, the primary issue is whether Dann Marine has alleged a plausible

_____

[5] The Court applies New York law because the Transportation Agreement contains a governing law provision that specifies that the agreement shall be "construed [in accordance with] and governed by the general maritime law of the United States to the fullest extent applicable, supplemented only if and to the extent necessary by the laws of the State of New York," [Transportation Agreement § 17.4], and the parties do not otherwise dispute the application of New York law. As no party disputes the applicability of New York law, the Court concludes that it need not conduct a choice-of-law analysis. *See N. Am. Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 499 F.Supp.2d 361, 372–73 (S.D.N.Y. 2007).

theory of breach.  Logan contends that Dann Marine has not done so because the language of the termination provision clearly enabled Logan to terminate the agreement and the valid exercise of that right cannot substantiate a claim for breach. [Pl.'s Br. Supp. Mot. Dismiss 4–5.]   In contrast, Dann Marine argues that the termination provision clearly required Logan to provide notice as soon as it formed an intent to cease burning coal, which Logan allegedly did not do.  [Def.'s Opp'n 6–10.] In the alternative, Dann Marine suggests that (a) Logan's interpretation of the termination provision renders the contract illusory and (b) its interpretation of the termination provision is at least a reasonable one, which would demonstrate that the provision is ambiguous and that its breach of contract claim must survive dismissal therefor.  [*Id.* at 10–14.]  Logan opposes, arguing that a conditional option to terminate upon notice does not destroy the contract's mutuality of obligation and that the termination provision is, in any case, not ambiguous.  [Pl.'s Reply Br. 7–8.]

      To determine whether Dann Marine's breach of contract claim is plausible as alleged, the Court turns to familiar principles of contract interpretation.  Maritime contracts should be "construed like any other contracts: by their terms and consistent with the intent of the parties."  *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1087–88 (2020) (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31 (2004)). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent."  *Id.* at 1088 (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)).  If the contract is ambiguous, its meaning is a question of fact, which requires a determination of the

intent of the parties in entering into the agreement. *Id.* (citing 11 R. LORD, WILLISTON ON CONTRACTS § 30:7, at 116–119, 124). Accordingly, to determine whether the termination provision at issue contains a definite and precise meaning not susceptible to more than one reading, the Court turns to its plain language. *N. Am. Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 499 F.Supp.2d 361, 373 (S.D.N.Y. 2007) (citations omitted).

Section 2.2 of the Transportation Agreement reads as follows:

> 2.2   <u>Termination</u>. [Logan] may terminate this Agreement ***immediately upon written notice*** to [Dann Marine] ***in the event that*** [Logan] ***intends*** to permanently cease burning coal at the Facility ***for any reason***, ***including***, ***without limitation***, ***because of voluntary or discretionary business decision*** or as a result of any statute, rule, regulation, Legal Proceeding, Governmental Imposition, or otherwise.

[Transportation Agreement § 2.2 (emphasis added).] The Court finds the foregoing provision to be clear on its face: Logan had the right, but not the duty, to terminate the Transportation Agreement if, and only if, it decided to permanently cease burning coal at its facility, and to exercise this option—which arises "immediately" upon the occurrence of the condition—Logan was required to furnish Dann Marine with written notice. In other words, the Court agrees with Logan's straightforward interpretation of the provision.

The Court reads § 2.2 in this way for at least two reasons. First, the Court is not persuaded that the provision includes an implied obligation for Logan to notify Dann Marine as soon as Logan forms an intention to permanently cease burning coal at the facility, as Dann Marine suggests. [See Def.'s Opp'n 7–8.] Upon the occurrence

of this condition precedent, Logan had the right—but not the obligation—to terminate the agreement.  Nothing about the syntax or structure of the provision implies that Logan must exercise its option "immediately" upon forming such intention.  Reading the provision to contain an "immediacy obligation" would transform the text from a permissive right into a compulsory duty.  That reading is not supported.  Second, the Court rejects Dann Marine's argument that the use of the word "immediately" is rendered superfluous by Logan's interpretation.  [See Def.'s Opp'n 8–9.]  The word refers to when Logan's right to terminate comes into existence—not after the expiration of a period of time (a common construction)—but "immediately upon written notice."  The Court finds that the word has concrete meaning.

To be sure, § 2.2 is not the most precise articulation of Logan's termination option, nor is it the product of particularly artful drafting; but the task at hand is to discern whether the parties' intent is clearly expressed in the text, not whether the drafters could have exercised greater skill.  The Court concludes that the intent is clear and that Logan's reading is the correct one.

Armed with this interpretation of § 2.2 and assuming the truth of the allegations set forth in Dann Marine's Counterclaim, the Court turns to Logan's actions to determine whether it complied with the provision.  Well before March 2022, Logan appears to have pursued an end to coal combustion at its facility.  Logan and ACE were engaged in negotiations in 2021 to modify their arrangement and end Logan's use of coal at its facility, and on December 22, 2021, ACE filed a petition with the NJBPU to approve a settlement agreement between ACE and Logan.  While ACE

15

pursued the bureaucratic steps necessary to wind-down coal-fired electric generation in the State of New Jersey, Logan continued burning coal at its facility.  But on March 18, 2022, Logan notified Dann Marine that it intended to terminate the Transportation Agreement.  On April 13, 2022, after NJBPU approved the settlement agreement on March 23, 2022—which the Court understands was a prerequisite for Logan to permanently cease burning coal at its facility—Logan terminated the Transportation Agreement pursuant to § 2.2.  The Court finds that Logan's conduct was consistent with the express language of the termination procedure, as it exercised its option to terminate the Transportation Agreement in writing and upon notice to Dann Marine after it knew that it would no longer burn coal to generate electricity.  Accordingly, Dann Marine has not plausibly alleged that Dann Marine breached the Transportation Agreement.

The Court's finding necessarily disposes of Dann Marine's argument that § 2.2 is ambiguous, but its argument that Logan's reading of the termination provision renders the contract illusory warrants additional discussion.  [See Def.'s Opp'n 10–11.]  Dann Marine suggests that reading § 2.2 to permit Logan to terminate the agreement "months or even years" after forming an intent to cease burning coal at its facility would render the contract illusory, as no mutuality of obligation would exist because "Logan was free to terminate at any moment during the life of the contract, but Dann [Marine] was not."  [*Id.* at 11.]  Applesauce.

In general, a contract is said to be "illusory" for lack of mutuality of obligation when one party is bound to perform under the contract but the other is not.  *See, e.g.,*

*Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*, 132 N.E. 148, 149 (N.Y. 1921) ("Unless both parties to a contract are bound, so that either can sue the other for a breach, neither is bound.").  Strictly speaking, however, contracts must be supported by consideration, not mutuality of obligation.  *See* RESTATEMENT (SECOND) OF CONTRACTS: ADEQUACY OF CONSIDERATION; MUTUALITY OF OBLIGATION § 79 (stating that when the requirement of consideration is met, there is no additional requirement of "mutuality of obligation"); *id.*, cmt. f (explaining that mutuality of obligation is not essential to most contracts); *Weiner v. McGraw-Hill, Inc.*, 443 N.E.2d 441, 444 (N.Y. 1982) (explaining that mutuality of obligation is not necessary for a contract to be binding when the promisor receives other valid consideration).  Thus, where an agreement is said to contain no "mutuality of obligation," the true defect is that the agreement is lacking in consideration.  *See Oscar Schlegel Mfg. Co.*, 132 N.E. at 149 ("Mutual promises or obligations of parties to a contract, either express or necessarily implied, may furnish the requisite consideration. The defect in the alleged contract here under consideration is that it contains no express consideration, nor are there any mutual promises of the parties to it from which such consideration can be fairly inferred."); *Curtis Props. Corp. v. Greif Cos.*, 212 A.D.2d 259, 265 (N.Y. App. Div. 1995) ("Because the promises of both parties to a bilateral contract must be supported by consideration, the contract is unenforceable if the promise of either party is illusory."); *see also Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 214–15 (N.Y. 1917) (Cardozo, J.) (rejecting designer's argument that agreement with marketer to split profits and for marketer to provide monthly accountings was void for want of

mutuality where marketer had not promised to use reasonable efforts to make sales, as such promise could be implied).

Accordingly, while an agreement permitting one party to terminate at any time without notice is "illusory" where the counterparty has no such right as the party is not, properly understood, "bound to do anything," *see Dorman v. Cohen*, 66 A.D.2d 411, 415–16 (N.Y. App. Div. 1979) ("While mutuality of obligation does not mean equality of obligation, it does mean that each party [m]ust be bound to some extent."), an agreement that confers to one party a conditional right or "option" to terminate upon notice is not illusory, *see id.* at 419 ("It is well recognized that a restricted option to terminate an agreement does not destroy its mutuality of obligation, for example, the reserving to one of the parties the right to terminate the agreement upon thirty days' notice does not deprive the agreement of the element of mutuality[.]") (internal citations omitted). Moreover, courts strongly disfavor an interpretation that renders a contract illusory. *See Credit Suisse First Boston v. Utrecht-Am. Fin. Co.*, 80 A.D.3d 485, 488–89 (N.Y. App. Div. 2011) ("an interpretation that renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is preferred, particularly where, as here, the parties have expressed their intent to be contractually bound in a writing.") (internal citations omitted).

Here, the Transportation Agreement conferred upon Logan a limited option to terminate if and only if it decided to permanently cease burning coal at its facility, and it could exercise such right to terminate only upon written notice to Dann Marine. [See Transportation Agreement § 2.2.] Logan's termination option, restricted by its

very nature and exercisable only upon written notice to Dann Marine, is thus enforceable, and the Transportation Agreement is accordingly not illusory for want of mutuality of obligation.[6]  *See Dorman*, 66 A.D.2d at 419; *see also Sylvan Crest Sand & Gravel Co. v. United States*, 150 F.2d 642, 644–45 (2d Cir. 1945) (refusing to interpret agreement to be illusory by implying that termination by one party could be accomplished only upon reasonable prior notice to the other party, which constitutes consideration of latter's promise to perform).

Next, Dann Marine claims that, even if Logan validly terminated the Transportation Agreement in accordance with § 2.2, Logan is still liable to Dann Marine for damages arising from Logan's termination, i.e., lost revenues under the contract ($4,393,066.20).  [Def.'s Opp'n 13–14; Countercl. ¶ 41.]  The Court fails to see how Dann Marine's assertion can be plausible; Dann Marine does not explain the basis for holding Logan responsible for its lost revenues where Logan is otherwise found to have complied with the Transportation Agreement.  For Dann Marine to recover such damages arising from Logan's "early termination," Dann Marine must point to express language in the agreement or establish a *prima facie* case for breach of

---

[6] The Court also observes, as indicated by Logan [Pl.'s Reply Br. 8 n.2], that if Dann Marine were correct that Logan's interpretation of § 2.2 renders the Transportation Agreement illusory, then its breach of contract claim would necessarily fail—there would not be an enforceable agreement for this Court to vindicate.  Dann Marine's argument is thus puzzling, as it would prove too much.  In other words, it is not clear to the Court what the upshot of Dann Marine's mutuality of obligation argument is.  *See Damato v. Time Warner Cable, Inc.*, 2013 WL 3968765, at *6 n.6 (E.D.N.Y. July 31, 2013) (explaining that an "illusory contract is void for lack of consideration," meaning that a contract failed to manifest *ab initio* and cannot be enforced as written).

contract.  *See Global Crossing Bandwidth, Inc. v. PNG Telecomms., Inc.*, 2008 WL 2079914, at *5 (W.D.N.Y. May 15, 2008) (addressing party's liability for injured counterparty's damages ***only after*** finding that agreement did not permit party's early termination and that such party was thus in breach); *see also Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.") (citation omitted).  "One who violates his contract with another is liable for all the direct and proximate damages which result from the violation."  *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (1886).  But absent express language to the contrary, the inverse is obviously not true: a party that ***complies*** with a contract is not liable for a counterparty's damages.[7]  *See Twitchell v. Pittsford*, 106 A.D.2d 903, 904 (N.Y. App.

---

[7] Notwithstanding Dann Marine's argument [Def.'s Opp'n 13], the Limitation of Damages provision is not to the contrary.  The provision expressly ***limits*** a "liable party's" liability under the agreement to direct actual damages only, unless the agreement expressly provides otherwise. [Transportation Agreement § 10.3.]  In fact, the provision begins, "FOR ***BREACH*** OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS HEREIN PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE LIABLE PARTY'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT."  [*Id.* (emphasis added).]   The language that Dann Marine quotes—"IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY HEREIN PROVIDED, THE LIABLE PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY." [Def.'s Opp'n 13 (quoting Transportation Agreement § 10.3)]—immediately follows the foregoing language and, read naturally, presumes that the "liable party" is, in fact, ***liable***—having "breached" an applicable provision.  Thus, § 10.3 does not

Div. 1984) ("When a contract is terminated, such as by expiration of its own terms, the rights and obligations thereunder cease.") (citations omitted).

Furthermore, Dann Marine claims that Logan is liable for breach of contract because Logan allegedly failed to pay (a) for repairs after damaging Dann Marine's barge during the course of loading and unloading cargo and (b) demurrage for the time lost while the barge awaited repairs. [Countercl. ¶¶ 34–37, 42–43.] Specifically, Dann Marine asserts that Logan breached the Transportation Agreement by "failing to pay the cost of towing the Barge 7253 to and from the repair yard, which amounts to $90,000" and by "failing to pay demurrage to Dann [Marine] for the time lost by the Barge 7253 awaiting repairs, which amounts to $675,000." [*Id.* ¶¶ 42, 43.]

Logan seeks to dismiss both claims. [Pl.'s Br. Supp. Mot. Dismiss 5–6.] First, Logan argues that Dann Marine's claim for towing costs is moot. The Transportation Agreement requires Logan to pay the cost of repairing (or reimbursing Dann Marine for) any damage to the barge caused by Logan or its agents, other than normal wear and tear, resulting from the loading or unloading of cargo. [See Transportation Agreement § 5.4; Countercl. ¶ 35.] After commencing this action, Logan paid Dann Marine its demanded sum of $90,000 in towing costs "under protest" to "resolve this issue in the short term," indicating that it would seek leave to amend its Complaint to recover the $90,000 should this case proceed forward. [Pl.'s Br. Supp. Mot. Dismiss 6.] Dann Marine contends that its claim for towing costs is not moot because Logan

---

*enhance* the scope of Logan's liability, nor does it provide an independent cause of action for Dann Marine's losses. Its argument to the contrary is without merit.

21

has reserved the right to demand repayment at some future date. [Def.'s Opp'n 15.] But Logan responds that, if the Court grants its Motions, then it will be barred by *res judicata* from seeking to recover the towing costs (because it will not be able to pursue recovery as a counterclaim). [Pl.'s Reply Br. 10.] Logan does not allege under what contractual basis it would be enabled to recover the towing costs it paid under protest should it seek leave to amend its Complaint. [*See id.*]

Because Logan has paid Dann Marine's towing costs and § 5.4 of the Transportation Agreement seems to support Dann Marine (though the Court adopts no legal or factual findings in this regard), this issue would appear to be moot. Still, because Logan paid the towing costs "under protest" and could seek leave to amend its Complaint to include a claim to recover such costs (as it has represented it would do), a live controversy lingers. *See Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994) (explaining that a case is only moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome") (citations omitted). Accordingly, the Court cannot dismiss Dann Marine's claim for towing costs at this stage based on the parties' representations.[8]

Second, Logan argues that Dann Marine's claim for demurrage must be dismissed as well because Dann Marine is not entitled to demurrage under the agreement: the Transportation Agreement sets forth a procedure for Dann Marine to

---

[8] Should Logan seek leave to amend its Complaint following the issuance of this Opinion, Logan should consider carefully whether it has a cognizable claim to recover (and avoid payment of) the repair costs.

be entitled to demurrage, Dann Marine failed to abide by that procedure, and its entitlement to demurrage did not survive termination in any case.  [*See* Pl.'s Br. Supp. Mot. Dismiss 5–6; Pl.'s Reply Br. 9–10.]  Dann Marine argues that its claim does not arise under the Transportation Agreement, but rather is a claim for "implied demurrage" arising under maritime law.  [Def.'s Opp'n 14–15.]  It explains that its claim is based on the delays resulting from the damage Logan caused to its barge and Logan's initial refusal to pay the cost of towing its barge to a repair yard.  [*Id.*]  Dann Marine nevertheless demanded $675,000 after considering the rate set forth in the Transportation Agreement (*i.e.*, $375 per hour).  [*Id.* at 15.]

Generally, under maritime law, a shipowner is entitled to be paid a reasonable sum as demurrage where its vessel is detained beyond the terms of its charter.  70 AM. JUR. 2D *Shipping* § 710.  "Damages for lost profits arising from the loss of use of a damaged vessel 'has traditionally been called detention' and is also sometimes referred to as 'demurrage.'"  *Great Lakes Bus. Trust v. M/T ORANGE SUN*, 855 F.Supp.2d 131, 149 n.8 (S.D.N.Y. 2012) (quoting *Bolivar Cnty. Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306, 1308 n.2 (5th Cir. 1978)).  In order to recover such damages while a vessel is detained pending repairs, the shipowner must provide evidence of the profits it would have earned had the vessel been operable.  *See id.* at 150 (citing *The Potomac*, 105 U.S. 630 (1881)).  "[I]n the absence of a stipulated rate, a reasonable rate of demurrage or damages in the nature of demurrage is normally applied."  *Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 90 (2d Cir. 1984).  "[D]emurrage is merely an allowance or compensation for the delay or detention of a

23

vessel.  It is often a matter of contract, but not necessarily so." *The Apollon*, 22 U.S. 362, 378 (1824).

Here, Dann Marine's claim for demurrage fails as pled.  To the extent that it seeks to recover lost profits while its barge awaited repairs due to damage caused by Logan following Logan's termination of the Transportation Agreement, then Dann Marine must set forth greater detail concerning its loss of use claim, including the profits it would have earned had its vessel not been disabled and its good faith efforts to mitigate damages and/or repair its vessel expeditiously.  *See Great Lakes Bus. Trust*, 855 F.Supp.2d at 150.   In any case, Dann Marine identifies its entitlement to demurrage as a breach of contract claim, not an independent claim for "implied demurrage."  [See Countercl. ¶ 43 ("Logan further breached the [Transportation] Agreement by failing to pay demurrage to Dann [Marine] for the time lost by the Barge 7253 awaiting repairs").]  The Transportation Agreement provides, in pertinent part, that:

> The Parties agree that demurrage at the Facility will only apply when [Dann Marine] has scheduled the Barge for other work between deliveries to the Facility.  [Dann Marine] shall provide notice of alternative use to Logan at least seventy-two (72) hours prior to the arrival of the Barge to the Facility.

[Transportation Agreement § 6.3.] The pleadings fail to allege that Dann Marine complied with the demurrage provision.  It has not alleged that it notified Logan regarding alternative uses of its barge, nor that Logan prevented it from scheduling its barge for other work.  Dann Marine has not provided any details in this regard.  Accordingly, Dann Marine cannot maintain its breach of contract claim for

24

demurrage, nor has it alleged sufficient information for this Court to permit it to proceed with an "implied demurrage" claim independent of the parties' agreement.

In sum, with the exception of Dann Marine's claim for towing costs, Dann Marine's breach of contract claims fail as pled. To the extent that Dann Marine is capable of pleading an implied demurrage claim—a proposition not altogether clear based on the parties' briefs—then it may file an Amended Counterclaim to include a claim for implied demurrage.

### 2.    *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Next, the Court addresses Dann Marine's breach of the implied covenant of good faith and fair dealing claim. Logan argues that the claim must be dismissed because it contravenes the express terms of the Transportation Agreement, does not apply to the termination of a contract, and otherwise duplicates Dann Marine's breach of contract claim(s). [Pl.'s Br. Supp. Mot. Dismiss 6–7.] Dann Marine opposes, arguing that its implied covenant claim can coexist with its breach of contract claims and demonstrates Logan's bad faith conduct. [Def.'s Opp'n 16–18.] It maintains that Logan was required to "forthrightly and promptly notify Dann [Marine] of its intentions so that Dann [Marine] could make preparations for a termination, such as searching for other employment for the barge, reallocating personnel and tugboats, and so forth." [*Id.* at 18.]

In general, every maritime contract imposes an obligation of good faith and fair dealing on the parties thereto. *Rocque v. Zetty, LLC*, 456 F.Supp.3d 257, 262–63 (D. Me. 2020). But maritime law is silent as to whether a breach of the implied covenant

25

of good faith and fair dealing claim can exist independently of a breach of contract claim. *Id.* at 263. Where maritime law is silent, New York law is not: while an implied covenant claim can ***coexist alongside*** a claim for breach of contract, it cannot be maintained as a separate cause of action where it is premised on the same alleged facts as the breach of contract claim or is otherwise duplicative. *District Lodge 26 v. United Techs. Corp.*, 610 F.3d 44, 54 (2d Cir. 2010); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *Costoso v. Bank of America, N.A.*, 74 F.Supp.3d 558, 573 (E.D.N.Y. 2015); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 205 (S.D.N.Y. 2011). Here, assuming the truth of the facts alleged in Dann Marine's Counterclaim, the Court finds that Dann Marine's breach of implied covenant claim is duplicative of its breach of contract claim, as both are premised on the same conduct—Logan's early termination of the Transportation Agreement. Both claims are focused on whether Logan permissibly terminated the agreement: the latter considers whether Logan complied with the express terms of the provision, and the former is directed to whether Logan "inserted the termination provision" in bad faith, knowing "that is was likely to cease burning coal before the end of the contract's term." [Def.'s Opp'n 17.] Because the alleged facts and damages are not materially different, the Court dismisses Dann Marine's breach of implied covenant claim as pled. *See, e.g.*, *Ellington Credit Fund, Ltd.*, 837 F.Supp.2d at 205 (as the claims are "functionally identical," "the implied covenant claim warrants dismissal").

In any case, assuming *arguendo* that Dann Marine could maintain its breach of implied covenant claim as an independent cause of action, it still must be dismissed

26

because the conduct allegedly constituting breach contravenes the express language of the Transportation Agreement. As set forth above, under maritime and New York law, a covenant of good faith and fair dealing is implied in all contracts. *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 631 (N.Y. App. Div. 2002) (citations omitted). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) (cleaned up) (citations omitted). "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983).

Indeed, the obligation of good faith and fair dealing "does not negate a[n] expressly bargained-for clause that allows a party to exercise its discretion." *Paxi, LLC v. Shiseido Americas Corp.*, 636 F.Supp.2d 275, 286 (S.D.N.Y. 2009) (discussing *Moran v. Erk*, 901 N.E.2d 187 (N.Y. 2008)). In *Paxi*, the court considered a contractual provision that permitted termination at will and without cause upon five (5) days prior written notice. *Id.* at 279. There, a cosmetics retailer sued to enjoin its wholesaler from terminating a supply agreement after the retailer executed an addendum with the wholesaler and moved store locations from Chevy Chase, Maryland to Washington, D.C. *Id.* at 281. In refusing to prohibit the wholesaler from terminating its arrangement with the retailer, the court held that the contract and addendum did not "impos[e] any good faith limitations on [the wholesaler's] absolute right to terminate."

27

*Id.* at 286.   As the court further explained, by signing the addendum without a modification to the termination right, the retailer "assumed the risk that [the wholesaler] would terminate the agreement before it had recouped its investment in the new space." *Id.*   To protect its interest, the party should have negotiated a limitation.   *Id.*; *see also So. Telecom Inc. v. ThreeSixty Brands Grp.*, 520 F.Supp.3d 497, 508 (S.D.N.Y. 2021) ("Imposition of a duty of good faith was not necessary to give the contractual promises meaning . . . . An indefinite extension of the Retailer Agreement would have given it a benefit for which it had not bargained and which was not necessary to give the agreement meaning.").

Here, as in *Paxi*, Dann Marine's implied covenant claim fails for the additional reason that an obligation of good faith and fair dealing cannot contravene the express terms of the parties' contract.   Section 2.2 permitted Logan to terminate its agreement upon written notice to Dann Marine if it decided to permanently cease burning coal at its facility.   Cessation of burning coal was an expressly disclosed possibility in the very provision Logan invoked to terminate the Transportation Agreement.   Dann Marine assumed the risk that Logan may not require its services for the full term of their agreement.   Because this eventuality came to pass, Dann Marine cannot argue now that Logan exhibited bad faith.   *See Paxi, LLC*, 636 F.Supp.2d at 286.[9]

---

[9] Dann Marine suggests that Logan's reliance on *Paxi*, in addition to another case not cited here, is misplaced, as the agreement there permitted either side to terminate at will and without cause.   [Def.'s Opp'n 17 n.3.]   Its argument misperceives the proposition for which *Paxi* (and *Moran*) is cited.   Here, Logan complied with the bargained-for termination provision, so this Court will not impose a "bad faith" rule through the implied covenant of good faith and fair dealing to contravene the textual

Therefore, the Court will dismiss Dann Marine's breach of implied covenant of good faith and fair dealing claim.

### 3. Fraudulent Inducement

Next, the Court considers Dann Marine's claim for fraudulent inducement. Dann Marine asserts that Logan inserted § 2.2 in the Transportation Agreement knowing that "there was a likelihood that Logan would cease burning coal at the Facility before December 31, 2024, but Logan did not disclose such knowledge to Dann Marine." [Countercl. ¶ 51.]  This failure to disclose such knowledge is alleged to constitute an omission of material facts and to have been calculated to induce Dann Marine to agree to below-market rates.  [*Id.* ¶¶ 52, 53, 54.]  Logan argues that the fraudulent inducement claim must be dismissed because the alleged "fraud"—that it might permanently cease burning coal prior to the end of the term of the agreement—was disclosed in the Transportation Agreement.  [Pl.'s Br. Supp. Mot. Dismiss 8.]  It also contends that Dann Marine's claim violates the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and is, again, based on its breach of contract claim.  [*Id.* at 8–9.]  Dann Marine disputes Logan's contentions, principally arguing that it presumed Logan would perform until the end of the contract's term.  [Def.'s Opp'n 18–19.]

The Court agrees with Logan insofar as the purported omission of material fact

_____

discretion conferred upon Logan.  Like the injured party in *Paxi*, Dann Marine should have bargained for a stronger limitation on Logan's right to terminate.  "It did not." *See Paxi, LLC*, 636 F.Supp.2d at 286.

alleged in Dann Marine's Counterclaim is plainly disclosed in the Transportation Agreement.   To prove fraudulent inducement under New York law, a plaintiff must establish "(1) that the defendant made a representation [or omission], (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986). Here, the alleged omission of material fact by Logan concerned if and when it might exercise discretion to terminate the Transportation Agreement pursuant to § 2.2.   The "fraud" that Dann Marine alleges was thus plainly disclosed in the Termination Agreement.   Logan and Dann Marine agreed that Logan would have an option to terminate the agreement upon notice to Dann Marine if Logan intended to permanently cease burning coal at its facility.   Based on the language of § 2.2, Dann Marine cannot claim that it was not aware that Logan might cease burning coal before the end of the agreement's term.   Accordingly, even assuming the truth of the facts alleged in the Counterclaim, Dann Marine has not set forth a plausible theory of fraudulent inducement. *See Syntex Corp.*, 786 F.2d at 76 (setting forth the eight elements that must be proved to succeed on such claim).   Therefore, the Court will dismiss Dann Marine's fraudulent inducement claim as well.[10]

---

[10] Because the Court concludes that Dann Marine's theory is deficient because the alleged omission is expressed in the termination provision of the Transportation Agreement, the Court need not address Logan's other arguments. While Dann Marine's counterclaim for fraudulent inducement fails as pled, it may file an Amended

#### 4. *Unjust Enrichment*

Finally, the Court addresses Dann Marine's claim for unjust enrichment. It contends that Logan is liable for unjust enrichment because it entered into an agreement with ACE to cease burning coal at its facility in exchange for $120 million while enjoying "below-market rates" under the Transportation Agreement. [Countercl. ¶¶ 56–60.] Accordingly, equity and good conscience require Logan to compensate Dann Marine for its losses. [*Id.* ¶ 60.] Logan argues that a quasi-contractual claim is barred where the parties have a written contract governing the subject matter at issue and that Dann Marine has failed to allege how it is entitled to compensation pursuant to Logan's independent agreement with ACE. [Pl.'s Br. Supp. Mot. Dismiss 9.] Dann Marine argues that equity and good conscience require that Logan compensate it for terminating the Transportation Agreement before the end of its term. [Def.'s Opp'n 20–21.]

Both parties direct this Court to apply New York law to consider Dann Marine's unjust enrichment claim, so the Court assumes that maritime law does not apply. *See Skippers & Maritime Srvs. Ltd. v. KfW*, 2008 WL 5215990, at *4 n.7 (S.D.N.Y. Dec. 8, 2008) (applying New York law where parties provide "implied consent" to use a forum's law, as opposed to general maritime law principles). Under New York law, to prevail on a claim for unjust enrichment, a plaintiff must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3)

---

Counterclaim if it can cure the deficiencies identified and/or set forth a plausible theory of fraudulent inducement.

that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff.  *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir. 1986).  However, "[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) (observing that unjust enrichment lies as a quasi-contract claim "imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned").

Here, Dann Marine cannot prevail on its claim for unjust enrichment because a valid and enforceable written agreement governs this dispute.  In any case, even assuming that Logan was enriched at Dann Marine's expense, Dann Marine has not plausibly alleged that equity requires Logan to compensate it for terminating the Transportation Agreement pursuant to the plain language of § 2.2.  Nor has Dann Marine explained how it is entitled to funds arising from a separate agreement between Logan and ACE to which it is not a party.  Therefore, Dann Marine's unjust enrichment claim must be dismissed.

### B.    Motion for Summary Judgment

Logan's Motion for Summary Judgment on its claim for declaratory relief is premised entirely on its assertion that it validly terminated the Transportation Agreement on April 13, 2022 pursuant to § 2.2 thereof.  [Pl.'s Br. Supp. Mot. Summ. J. 3.]  As explained above, the Court agrees with Logan's plain reading of § 2.2 and

finds that it complied with the Transportation Agreement when it provided written notice of termination to Dann Marine after forming an intention to permanently cease burning coal for electric generation at its facility.  See *supra* Part A.1.  Dann Marine's purported affirmative defenses and arguments are not to the contrary.[11]  However, there remain disputes concerning whether Logan is liable for "implied demurrage" and towing costs associated with the repair of Dann Marine's barge.  Moreover, the Court will grant Dann Marine leave to file an Amended Complaint, if it chooses, to remedy the deficiencies identified in this Opinion.  Accordingly, the Court concludes that Logan has demonstrated that there is no genuine dispute as to any material facts of its declaratory relief claim as to its interpretation of the termination provision of the Transportation Agreement and that it is entitled to judgment as a matter of law as to such interpretation.  *See* FED. R. CIV. P. 56(a).  But summary judgment is not appropriate at this stage as to Logan's other obligations under, or in connection with, the Transportation Agreement.  Therefore, the Court will deny summary judgment as to such obligations.

## V.    CONCLUSION

For the reasons set forth above, Logan's Motion to Dismiss will be **GRANTED**, in part, and **DENIED**, in part.  Additionally, Logan's Motion for

---

[11] The Court notes that Dann Marine sets forth three "additional points" in response to Logan's Motion for Summary Judgment, [Def.'s Opp'n 22–23], but each point simply recasts its prior arguments in a slightly different way or raises an issue that would not preclude the relief Logan seeks.  Accordingly, the Court finds that Dann Marine's "additional points" do not warrant further discussion.

Summary Judgment will be **GRANTED**, in part, and **DENIED**, in part. An accompanying Order shall issue on today's date.

**April 18, 2023**
Date

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge